**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **SAMUEL LEWIS FOWLER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No: 5:20-cv-00171-CAR-CHW** |
| | : | |
| **Warden CLINTON PERRY JR,** *et al.*, | : | **Proceedings Under 42 U.S.C. § 1983** |
| | : | **Before the U.S. Magistrate Judge** |
| **Defendants.** | : | |
| | : | |

## ORDER & RECOMMENDATION

Plaintiff initiated this case pursuant to 42 U.S.C. § 1983. His amended complaint (Doc. 25) included claims against multiple defendants from several agencies and prison facilities. Following the Court's screening review of the amended complaint, Plaintiff's failure-to-protect claims against Defendants from Central State Prison, Augusta State Medical Prison, and Johnson State Prison were permitted to move forward for factual development. (Docs. 28, 43). The Johnson State Prison Defendants have been dismissed. (Docs. 74, 76, 96). All Defendants, except Defendant Nichols,[1] who has not been served, filed a motion for summary judgment based upon Plaintiff's failure to exhaust and qualified immunity. (Doc. 138). As will be fully discussed below, Plaintiff failed to exhaust his claims from Central State Prison but exhausted his claims from Augusta State

---

[1] Defendant Nichols, from Central State Prison, is the sole remaining unserved Defendant. The Court previously recognized this omission and ordered personal service on Defendant Nichols and two other, then unserved, Defendants. (Doc. 96). When personal service on Defendant Nichols was unsuccessful (Doc. 106), the Court issued a show cause order for Plaintiff to provide additional information to facilitate service. (Doc. 111). Plaintiff did not provide any new information and stated that he would endeavor to learn more about Defendant Nichols through discovery. (Doc. 117). Over two years have passed since the Court's screening order, and it has been almost a year since the show cause order was entered, without any updated information about Defendant Nichols. As cautioned in the screening order, is it **RECOMMENDED** that all claims against Defendant Nichols be **DISMISSED without prejudice** pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

Medical Prison. The Augusta State Medical Prison defendants are, however, entitled to qualified immunity. Therefore, it is **RECOMMENDED** that Defendants' motion for summary judgment (Doc. 138) be **GRANTED** and that Plaintiff's claims against the remaining Central State Prison Defendants be **dismissed with prejudice**[2] and his claims against the August State Medical Prison Defendants be **dismissed with prejudice**. The other pending motions and notices are addressed herein.

## PROCEDURAL HISTORY

This case has a prolonged and tortuous procedural history. Plaintiff first commenced this action in April 2020.[3] He was instructed to recast his complaint, which he finally did in December 2020, but not before the case had been dismissed for failure to follow the Court's order. (Docs. 16, 19, 25). The case was reopened to permit screening of Plaintiff's complaint. (Docs. 20, 26). Following the February 2021 screening review of the amended complaint, claims against remaining Defendants Warden Perry, Deputy Warden Spikes, Deputy Warden Michael Thomas,[4] Deputy Warden Hall, Captain Davis, and Sergeant Searcy from Central State Prison (CSP), and Defendants Warden Philbin and Unit Manger McDowell from Augusta State Medical Prison

---

[2] Because the events alleged in the Complaint occurred in May 2018, it appears the statute of limitations may have run. "[W]here a dismissal without prejudice has the effect of precluding the plaintiff from re-filing his claim due to the running of the statute of limitations, it is tantamount to a dismissal with prejudice." *Stephenson v. Doe*, 554 F. App'x 835, 837 (11th Cir. 2014) (citing *Justice v. United States*, 6 F.3d 1474, 1482 n.15 (11th Cir. 1993)). Georgia's renewal statute, O.C.G.A. § 9-2-61, applies to Section 1983 suits voluntarily and involuntarily dismissed, and Plaintiff could refile within six months of dismissal, subject to payment of the costs of the dismissed suit before recommencing the action. *Hancock v. Cape*, 875 F.3d 1079 (11th Cir. 2017). Here, however, Plaintiff is unlikely to overcome the deficiencies underlying his failure to exhaust. Therefore, any dismissal without prejudice will operate as a dismissal with prejudice.

[3] Plaintiff's complaint is dated April 2, 2020, but it was not received until May 5, 2020. (Doc. 1). Plaintiff explained in his deposition that he had family help him mail the initial complaint. (Doc. 138-2, p. 113). Defendants' failure to exhaust argument does not hinge on a specific commencement date, and therefore, use of the mailbox rule to determine the date Plaintiff commenced his suit is not at issue.

[4] The screening order lists two defendants named Thomas. This appears to be a scrivener's error as Plaintiff listed only one defendant named Thomas in his complaint (Doc. 25), only one such defendant was served with process (*see* (Docs. 47, p. 5; 67. 68)), and only one such defendant is referenced in Plaintiff's deposition. (Doc. 138-2).

2

(ASMP). (Docs. 28, 43). Plaintiff's surviving claims allege that the CSP Defendants knew that Plaintiff had been approached, threatened, and attacked by gang members at CSP, but despite repeated letters requesting help, they failed to protect him, and he was choked and raped on May 18, 2018. (Doc. 25). Plaintiff claims that ASMP officials also failed to protect him upon his transfer because they knew he had been attacked at CSP but placed him general population. (*Id.*) He was attacked on unspecified dates after gang members at CSP contacted fellow gang members at ASMP. (*Id.*) Plaintiff alleged that the ASMP Defendants knew about these attacks and did nothing to protect him. (*Id.*) He also sought to bring similar claims against officials from Johnson State Prison (JSP). (*Id.*)

Between April 2021 and July 2022, answers and motions to dismiss trickled in as Defendants either acknowledged service or were personally served after court order. (Docs. 51, 52, 68, 69, 103, 109). Claims against all JSP Defendants were dismissed for failure to exhaust, except for the claims against Defendant Dumas who died before receiving service of process. (Docs. 74, 76, 96). Plaintiff tried multiple times to amend his complaint to re-add the JSP Defendants or other parties, but those motions were denied. *See, e.g.*, (Docs. 46, 50, 61, 74, 91, 95, 96, 126, 131). There have been multiple motions regarding discovery, dispositive motions, and requests to stay this case, which have been adjudicated in various ways. *See, e.g.*, (Docs. 66, 88, 92, 93, 94, 96, 97, 129, 131, 140, 141, 143, 145). Discovery is now closed.

In January 2023, Plaintiff also filed an interlocutory notice of appeal from an order denying his motion to stay any motions for summary judgment and to compel a third set of discovery requests. (Docs. 145, 148). The appeal was dismissed for lack of jurisdiction. (Doc. 153). Plaintiff has responded or objected to nearly every order or notice the Court has entered, and he asserts, again in multiple filings, that he awaits rulings from these objections and responses. *See, e.g.*,

(Docs. 140, p. 2; 147, p. 2; 159, p. 1-4). The docket reflects, however, that only three matters are pending, Defendants' motion for summary judgment (Doc. 138), Plaintiff's motion for an order for ASMP to make copies (Doc. 162), and Defendants' motion for leave to reply. (Doc. 164). To the extent Plaintiff's various notices or responses request review by the Court, it is recommended they be denied.

On December 22, 2022, the remaining Defendants filed a motion for summary judgment, arguing that Plaintiff failed to exhaust his available administrative remedies and that they are entitled to qualified immunity as to Plaintiff's failure-to-protect claims. (Doc. 138). The Clerk of Court provided notice to Plaintiff regarding the motion. (Doc. 139). There was a possible cross-over in the mail due to Plaintiff's prison transfer, and the Court directed defense counsel and the Clerk of Court to resend the motion and notice to Plaintiff. (Doc. 141). Defense counsel certified that the motion had been sent to Plaintiff at his current prison. (Doc. 142). Despite having received notice from the Court that Defendants had moved for summary judgment and an extension of the deadline to respond until February 1, 2023, (*see, e.g.*, (Doc. 145)), Plaintiff has asserted that he did not receive the Clerk of Court's notice (Doc. 139) until April 2023. (Doc. 157). Out of an abundance of caution, the Court again extended Plaintiff's time to respond until May 30, 2023. (Doc. 158).

Plaintiff filed a response (Doc. 159) and later filed a supplemental response. (Doc. 161). He also informed the Court that he intends to file a third response but requests a stay due to health concerns. (Doc. 163). All of Plaintiff's responses have been considered for purposes of this recommendation, even though he did not seek leave to file a supplemental response or surreply. This case was opened in May 2020, and the motion for summary judgment has been pending since December 2022. As Plaintiff has continued to submit multiple filings, the docket does not reflect

that Plaintiff's ability to file documents with the Court is hampered in any way. Therefore, to the extent his notice (Doc. 163) may be construed as a motion to stay this case, as a request for permission to file a third response or surreply, or as a request for extension of time to file a surreply, that request is **DENIED**.

In response to Plaintiff's supplemental response, Defendants filed a motion for leave to reply. (Doc. 164). In their motion, they argue that Plaintiff's supplemental response and request to file a third response are improper, but if the Court considers them, they ask to be granted permission to respond. By the time Defendants' motion was received, the entire docket had been considered, including Plaintiff's supplemental response. Based on the review of Plaintiff's supplemental response, the Court's denial of Plaintiff's request to file a third response, and the ultimate outcome of this recommendation, Defendants' motion for leave to file reply (Doc. 164) is **DENIED as moot**.

## RELEVANT FACTS

The record before the Court is sparse in terms of supporting materials, despite this case's lengthy procedural history. Defendants' motion for summary judgment fails to include any affidavit or sworn statement from any Defendant or other prison official with direct knowledge of any of the events underlying Plaintiff's claims. Defendants incorporated an affidavit attached to the JSP Defendants' motion to dismiss (Doc. 52), but that affidavit only establishes Plaintiff's grievance history and applicable grievance policy. Defendants have provided a transcript of Plaintiff's deposition (Doc. 138-2), as well as copies of grievances and responses. (Doc. 138-3). They claim to have provided a hospital treatment record from May 18, 2018, but this one-page document is an internal prison document entitled "offender hospital tracker record," with short notations about Plaintiff's hospital stay. (Doc. 138-4). No other medical records have been

5

submitted. Defendants chiefly rely upon Plaintiff's deposition, grievances, and his failure to provide letters written to prison officials to establish their statement of material facts. (Doc. 138-5). The facts that can be gleaned from that evidence are summarized below.

Plaintiff, who is serving at least one life sentence, was transferred to CSP in 2016. (Doc. 138-2, p. 21-22). Plaintiff worked in the tool shop at CSP, where he was approached by gang members and asked to be a "mule" for contraband, such as drugs, phones, and cigarettes, entering the prison through the tool shop. (*Id*. at 24-27). Plaintiff told the gang members that he was not interested in working for them. (*Id*. at 27). Plaintiff overheard threats being made against Defendant Spikes, and he told Defendant Spikes about the threat and incoming contraband. (*Id*. at 27-29). Plaintiff continued to be asked to act as a mule, and upon his refusal, threats were made against him. (*Id*. at 27-30). He continued to write Defendants Perry, Thomas, Spikes and Hall about the incoming contraband and threats against him. (*Id*. at 30, 96-98). Plaintiff also personally talked to Defendant Spikes about the threats when they were both in the wood shop, and Plaintiff asked to be transferred. (*Id*.) Plaintiff testifies that his meeting with Defendant Spikes led to Plaintiff speaking to a CERT investigator. (*Id*. at 33-34). Plaintiff also spoke to a CID investigator, and Plaintiff believes that Plaintiff's bunkmate, Inmate Bowden, witnessed this meeting. (*Id*. at 35-36).

Several weeks later, around Christmastime 2017, Plaintiff was leaving the dining hall when he was assaulted by two inmates, Mac and Fat Boy, for not agreeing to work for the gangs. (*Id*. at 30-32). This led to a meeting in Defendant Thomas's office with Defendant Perry, Spikes, and Hall. (*Id*. at 31, 35). Plaintiff felt that Defendant Perry blew off the attack and threats, and testifies that Defendant Spikes simply told him to fight back. (*Id*. at 32).

Plaintiff states that Defendant Hall also knew about issues concerning Inmate Bowden. (*Id.* at 38). After Defendants Perry and Spikes spoke to Inmate Bowden, Bowden returned to the cell and attacked Plaintiff. (*Id.* at 39-40). Plaintiff again asked Defendant Spikes for a transfer or housing reassignment. (*Id.* at 40). He also sought help from Defendant Davis, as her office was near Defendant Sikes, but she stated there was nothing she could do. (*Id.* at 94). Plaintiff was not moved, and threats from various inmates continued, some of which Defendant Searcy observed. (*Id.* at 40, 45-48). A couple of weeks prior to the May 18, 2018 incident, while he was in the insulin line, Plaintiff was hit in the head and attacked by Mac and Fat Boy with wooden shanks. (*Id.* at 43-45, 49). Defendant Nichols saw Plaintiff following the attack (*Id.* 46), and Plaintiff went to Defendant Spikes, who saw him bleeding. (*Id.* at 54). Plaintiff stated that he received some supplies from medical but was not treated by medical. (*Id.* at 56). He did not require stitches. (*Id.* at 111-112). Plaintiff met with a CERT officer again. (*Id.* at 50). Another inmate warned Plaintiff that Plaintiff needed to agree to move the contraband. (*Id.* at 53).

On May 18, 2018, Plaintiff suffered the assault that led to him being hospitalized and gives rise to the claims in this case. As was his practice, Plaintiff waited for Inmate Bowden to leave the cell in the early morning before attempting to go to sleep.[5] (*Id.* at 56-57). He had fallen asleep in the cell when he was attacked by an unknown assailant:

> I was lying on my right side and I thought somebody had hit my head. And then their arms went around me and it scared me real bad -- well of course. They'd had -- they put a chokehold on me real, real quick. And it seemed like forever, but they -- they was real -- real good at choking out; they were left-handed too.
>
> And the person said, you should have brought us our shit. And they squeezed, and you know, I -- I was trying to -- trying to, you know, turn my body,

---

[5] Plaintiff testifies that Bowden would not allow Plaintiff in the cell with him and that he regularly stayed in the common area until the early morning hours, when Bowden got up to go to work.

trying to turn my head. I had one arm, you know, trying to, you know, push the elbow trying to get, you know, room in between. You know, trying to not get choked out, but I went out.

I was woke up by inmates trying to wake me up when the inspection team was coming in. I remember Warden Perry and a whole bunch of administration and officers there. Mr. Perry had inmates to carry me up to medical. He wouldn't wait on the ambulance, the little cart thing, he had them to carry me to medical.

I don't remember how long I was there or anything, but they transferred me to -- to a local hospital. My right side was dead, you know.

I remember my mother had Bell's Palsy one time, and that's what I thought I had on the right side of my -- and my face had dropped.

I could think the words, but the words wouldn't come out my mouth. But I could communicate, I could -- you know, I could do my ABC's with my -- with my left hand, but I couldn't speak. But I could think the words in my head, they just wasn't -- wouldn't come out.

They did all kind of tests. They said that I had stroke-like symptoms from lack of oxygen, but I'd had no bleeds. That I was very lucky.

*Id.* at 56-57.

In his complaint and grievances, Plaintiff alleges that he was also raped during this incident, but his deposition testimony regarding the May 18, 2018 incident, excerpted above, does not describe a sexual assault of any kind. The only mention of rape in his deposition testimony relates to a grievance receipt. (Doc. 138-2, p. 85).

After less than two days in the hospital, Plaintiff was discharged back to CSP, where he was placed in administrative segregation, also known as "the hole." (*Id*. at 61; Doc. 138-4). Plaintiff remained in segregation until his transfer to ASMP in October 2018. (Doc. 138-2, p. 23, 61-64). Plaintiff has recovered from the numbness his experienced following the attack, but he no longer has a full range of motion in one elbow and can take a few steps with the use of a cane rather than a walker. (*Id*. at 110-11).

Plaintiff did not file any grievances at CSP from May 2017 until July 2018. (*Id*. at 100; Doc. 52-1, p. 26). Once he was at ASMP, Plaintiff filed grievances concerning the May 2018 CSP incident, and cited a missing grievance from July 2018. (Docs. 138-2, p. 85; 138-3, p. 16, 21). He admitted that he spoke to another investigator prior to his transfer, and a Prison Rape Elimination Act (PREA) investigation showed the May 2018 incident was unsubstantiated as of September 2, 2018. (Docs. 138-2, p. 70-71, 106; 138-3, p. 18). Plaintiff believed that staff members, such as Defendant Davis, would ask for the investigation to be reopened after he presented them with additional information. (Doc. 138-2, p. 94, 106).

Upon his transfer to ASMP in October 2018, Plaintiff asked to be placed in protective custody due to the incident at CSP, but he was placed in general population. (*Id*. at 23, 64). Within a couple of days of his arrival in general population, gang members approached him and said that they had received calls from gang members at CSP about Plaintiff costing gang members time, money, and property. (*Id*.) Plaintiff states he was initially protected by his dorm members, but that changed. (*Id*. at 65). His property was stolen, and he was slapped around. (*Id*.) These incidents escalated. On one occasion Plaintiff was choked out and assaulted, and on another occasion he was pistol whipped after refusing to perform oral sex on another inmate. (*Id*. at 65, 69). Plaintiff states that he filed grievances and that Defendants Philbin and McDowell knew about the incidents. (*Id*. at 66). Plaintiff provided no specific dates for the ASMP assaults in his deposition, but he states that he was pistol whipped and choked once before meeting with Defendant Philbin and choked once after filing a grievance. (*Id*. at 71, 75). Plaintiff required no stitches from being pistol whipped. (*Id*. at 111-112). Defendant Philbin and a CERT officer investigated but ultimately did not act upon Plaintiff's allegations. (*Id*. at 67-68). Plaintiff states that nothing was done until he and his family threatened to go to the media, at which time he was placed in protective custody. (*Id*. at 69).

He later fell in the shower, at which time Plaintiff was moved to a medical floor, where he stayed until moving to JSP in February 2019. (*Id.* at 23, 71).

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of informing the Court of the basis for its motion, and of citing "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that support summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In resolving motions for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).

Plaintiff responded to Defendants' motion for summary judgment. However, he did not specifically respond to the Defendants statement of material facts as required by Local Rule 56. This failure could trigger consequences under both the Federal Rules of Civil Procedure and this Court's Local Rules. Federal Rule of Civil Procedure 56(e)(2) provides that if a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion." Rule 56(e)(2). This Court's Local Rule 56 similarly provides: "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." MDGA Local Rule 56. Finally, Federal Rule of Civil Procedure 56(e)(3) provides that the Court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to" summary judgment. Rule 56(e)(3). *See also Urdaneta v. Wells Fargo Bank,*

*N.A.*, 734 F. App'x 701, 704 (11th Cir. 2018). Pursuant to Rule 56(c), the court "need consider only the cited materials, but it may also consider other materials in the record." Although Plaintiff did not specifically respond to the Defendant's statement of facts, the entire record has been considered as permitted by Rule 56(c)(3). As noted above, the evidence presented consists primarily of Plaintiff's deposition testimony and grievance history. Defendants have presented very little evidence to dispute Plaintiff's testimony.

## ANALYSIS

In their motion for summary judgment, Defendants argue both that Plaintiff failed to exhaust his claims at both CSP and ASMP and that they are entitled to qualified immunity because Plaintiff cannot establish that any Defendants failed to protect him. As discussed below, the evidence shows that Plaintiff failed to exhaust his administrative remedies at CSP, but exhaustion at ASMP cannot be foreclosed. Although it appears that Plaintiff exhausted his ASMP claims, the ASMP Defendants are entitled to qualified immunity.

### The Exhaustion Requirement

The Prison Litigation Reform Act (PLRA) requires prisoners to exhaust available administrative remedies before bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law. 42 U.S.C. § 1997e(a). Exhaustion in this context means proper exhaustion: prisoners must "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in a federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). The exhaustion requirement is "designed to eliminate unwarranted federal-court interference with the administration of prisons" by "seek[ing] to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Turner v. Burnside*, 541 F.3d 1077, 1085 (11th Cir. 2008).

The Eleventh Circuit's *Turner* opinion establishes a two-step process for reviewing motions to dismiss based on a prisoner's failure to exhaust. A reviewing court first "looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true. If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id*. at 1082. Second, if the complaint is not dismissed under step one, "the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion. …Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available administrative remedies." *Id*. at 1082-83 (internal citations omitted).

<u>Grievance Procedure</u>

The grievance procedure applicable in this case is set by the Georgia Department of Corrections (GDOC) Standard Operating Procedure No. 227.02. (Doc. 52-1, Ex. 1). Under that procedure, prisoners must follow a two-step process by first filing an "original grievance" within 10 days of the grievable issue. (*Id*. at 8).[6] Prisoners may file outside of the 10-day window if they show good cause. (*Id*.). The original grievance is then screened by prison staff, and typically either rejected or accepted for processing. (*Id*. at 9). The grievance procedure further provides that a response of some kind is due within 40 days of the date of a grievance's submission, with the possibility of a 10-day extension on written notice. (*Id*. at 11). On expiration of the response period or on the prisoner's receipt of a response, the prisoner must proceed to step two by filing a "central office appeal" within seven days. (*Id*. at 14). The grievance procedure then contemplates a 120-

---

[6] The referenced page numbers are from taken from the policy itself and not the document number in which the policy was attached.

day period in which the Commissioner may give a response. (*Id*. at 15). The grievance policy itself does not list any specific detail required for a grievance.

### 1. Failure to Exhaust

Even when a failure to exhaust is raised in a motion for summary judgment, determining whether dismissal is appropriate requires the Court to apply the test outlined in *Turner* to determine whether Plaintiff failed to exhaust the administrative remedies available to him. In considering whether dismissal for failure to exhaust is appropriate under *Turner*'s step one, a court must first consider all the alleged facts construed in favor of Plaintiff when the facts conflict. Plaintiff alleges that he filed grievances regarding the matters in his complaint, although he contends his grievance for the CSP claims was lost. Therefore, when the pleadings are construed in Plaintiff's favor, his claims at CSP and ASMP arguably survive under step one of *Turner*. Under step two of *Turner*, however, the record shows that Plaintiff failed to exhaust his administrative remedies at CSP prior to filing suit.

Under *Turner*'s second step, any disputed facts must be examined to determine if Plaintiff exhausted the available administrative remedies prior to filing suit. In support of their motion, Defendants provided copies of Plaintiff's grievances and incorporated a declaration attached to the JSP Defendants' motion to dismiss. (Docs. 52-1, 138-3). The records show that Plaintiff filed 15 grievances at three different prisons between 2018 and the time he commenced this suit in 2020. Prior to the incident date, May 18, 2018, Plaintiff filed only one grievance at CSP.

- <u>Grievance No. 242880</u> - Grievance No. 2422880 was filed on May 2, 2017, at CSP. (Doc. 52-1, p. 26). Plaintiff's grievance history categorizes this grievance as an American with Disabilties Act complaint. (*Id*.) It was rejected on June 5, 2017. (*Id*.)

- <u>Grievance No. 270609</u> - Grievance No. 270609 submitted on July 15, 2018, complained that when Plaintiff returned from the hospital on May 19, 2018, inmates stole his property while he was showering off pepper spray. (Doc. 138-3, p. 1, 8). Plaintiff asked for the property, which was listed in a May 27, 2018 letter, to be replaced. (*Id*.) He explained that he was placed in segregation and after multiple requests for grievance forms, he received two forms on July 11, 2018. (*Id*.) The warden rejected the grievance as being out of time. (*Id*.) Plaintiff appealed. (*Id*. at 1, 3). Plaintiff refused to sign the acknowledgement of the warden's denial of this grievance. (*Id*. at 6). The Central Office rejected the grievance as being out of time in October 2018. (*Id*. at 1, 2). In the appeal, Plaintiff noted that he had submitted two grievances on the same day, this one and one regarding the May 18, 2018 assault and rape. (*Id*. at 3). He noted that he had not received a response to the second, unnumbered grievance and wanted internal affairs to investigate. (*Id*. at 3-5). He also requested not to be transferred until the matters were resolved. (*Id*. at 5).

- <u>Grievance No. 276905</u> - On October 9, 2018, following his transfer to ASMP, Plaintiff filed Grievance No. 276905, complaining that had filed two grievances when he filed Grievance No. 270609, but the one about the staff's inaction leading to his assault had been ignored, and he therefore could not appeal it. (Doc. 138-3, p. 16, 21). He requested to be sent back to CSP for resolution of the missing grievance. (*Id*.) Responses to the grievance noted that Plaintiff was transferred because he feared for his life and refused to leave administrative segregation. (*Id*. at 16, 20, 22-23). Plaintiff had also been informed of the results of a PREA investigation. (*Id*.) Therefore, the grievance was initially denied. (*Id*. at 16-17). Plaintiff appealed and explained he understood that he was transferred to ASMP because of various medical issues. (*Id*. at 19). He acknowledged that he had been told the

results of the PREA investigation, but he also understood that staff would re-refer the matter. (*Id*.) He again requested to be returned to CSP. (*Id*.) The appeal was denied in January 2019, with an explanation that an investigation showed no evidence that he had submitted two grievances, that his assault claims had been unsubstantiated, and that he had failed to follow proper grievance policy. (*Id*. at 18).

- Grievance No. 276934 - Grievance No. 276934, also filed October 9, 2018, again raised the issue of the alleged missing July 15, 2018 grievance and stated that Counselor Chambers would look into it. (Doc. 138-3, p. 26, 30). Plaintiff stated that he wanted a response to the "staff's action or lack thereof." (*Id*.) Chambers admitted that she said she would check into the status of the grievances he filed, but Plaintiff was transferred before he was advised of the status. (*Id*. at 29, 31). The grievance was denied by the warden. (*Id*. at 28). Plaintiff appealed (*Id*. at 27), and his appeal was denied with a statement that Plaintiff was told on September 2, 2018, that his allegations of his assault were unsubstantiated. (*Id*. at 26).

- Grievance No. 276966 - Filed on October 19, 2018, Grievance No. 276966 complained that Plaintiff's medical file had not been transferred from CSP to ASMP. (Doc. 138-3, p. 33). Plaintiff alleged that the delay resulted from his records being redacted so that Defendants could prevail in court. (*Id*.) The grievance was deemed resolved because Plaintiff's record was at ASMP. (*Id*.)

- Grievance No. 277442 - On October 29, 2018, Plaintiff filed Grievance No. 27742, explaining that he was threatened by gang members on October 19, 2018. (Doc. 138-3, p. 34). He stated that although he had been protected by his dorm against the threats, that was no longer the case. (*Id*.) He asked to be transferred to a different dorm for his medical and

bodily safety, but not to be transferred to "the hole." (*Id*.) This grievance was interpreted as being against policy. (*Id*.) Plaintiff appealed, and the appeal was denied in February 2019. (*Id*. at 35). The appeal was denied because Plaintiff complained that he had not been paroled. (*Id*.) Those issues, as well as housing assignments, were non-grievable. (*Id*.)

- <u>Grievance No. 278470</u> - Plaintiff filed Grievance No. 278470 on November 19, 2018, to ask for additional medical care for issues relating to the CSP assault, to request a wheelchair, and to be given pain medication. (Doc. 138-3, p. 36). Plaintiff was instructed to submit a sick-call request, and the grievance was deemed partially granted. (*Id*.) Plaintiff appealed, and his appeal was denied after being forwarded to medical services for investigation. (*Id*. at 36-37).

- <u>Grievance No. 279460</u> - On December 3, 2018, Plaintiff submitted Grievance No. 279460 to request a transfer to Dorm 1-B because gang members would not allow him to turn on a device to help him hear the TV over the radio. (Doc. 138-3, p. 38). Plaintiff stated that he did not try to turn it on after being slapped about it before. (*Id*.) The grievance was denied for raising more than one issue. (*Id*.) Plaintiff appealed but the appeal was denied because Plaintiff had been transferred to JSP and no further action was warranted. (*Id*. at 39).

- <u>Grievance No. 279753</u> - On December 3, 2018, Plaintiff complained in Grievance No. 279753 that he missed a meal and pill call because he did not hear them being announced due to loss of his hearing aids at CSP in May 2018. (Doc. 138-3, p. 44, 50). He again asked to be moved to Dorm 1-B so that he could hear and would not be put at risk by gang members. (*Id*.) He asked to not be punished for filing the grievance. (*Id*.) The grievance was rejected for raising more than one issue. (*Id*. at 42-43). Plaintiff appealed. (*Id*. at 41).

16

The appeal was denied because the hearing issue was addressed in Grievance No. 280045. (*Id*. at 40).

- Grievance No. 280045 - Plaintiff submitted Grievance No. 280045 on December 3, 2018, because he could not hear and missed a pill call and meal. (Doc. 138-3, p. 52). He wanted to be moved to Dorm 1-B so that he would not miss another meal and gang members would not put him danger. (*Id*.) The initial investigation into the grievance noted that Plaintiff was scheduled for an audiology appointment in March 2019, but until then, he would receive a pocket amplifier. (*Id*.) Medical staff noted that he did not meet the parameters to be moved to the requested dorm. (*Id*.) Therefore, the grievance was deemed partially granted. (*Id*.) This grievance was not appealed (Doc. 52-1, p. 26). Plaintiff later noted that this grievance and Grievance No. 279753 were the same grievance. (Doc. 138-3, p. 41).

- Grievance No. 281546 - On January 14, 2019, Plaintiff complained about missing property and his property being mishandled. (Doc. 138-3, p. 46). Staff initially partially granted this grievance, and Plaintiff appealed. (*Id*. at 46-47). The appeal was partially granted. (*Id*. at 47).

- Grievance No. 283074 - In Grievance No. 283074, filed February 1, 2019, Plaintiff complained about a number of issues, primarily about his wheelchair being taken from him. (Doc. 138-3, p. 48). The grievance was rejected for raising more than one issue. (*Id*.) Plaintiff appealed, and in the rejection for raising more than one issue, central office staff noted that Plaintiff did not receive a "wheelchair profile" until after his transfer to JSP. (*Id*. at 49).

- Grievance Nos. 287539, 290108, 298629, 304562 - These grievances were filed prior to Plaintiff commencing suit, but they related to matters arising at JSP. (Doc. 52-1, p. 26).

### a. Plaintiff failed to exhaust his CSP claims

The strangulation and sexual assault incident upon which Plaintiff bases his failure-to-protect claims occurred May 18, 2018. It is undisputed that Plaintiff did not file a grievance at CSP in the year leading up to the incident. (Docs. 52-1, p. 26; 138-2, p. 100). This means Plaintiff did not grieve any alleged lack of staff response, any threat, or any attack prior to May 18, 2018. The point of the grievance process is to place prison on notice and allow them to address the issue. *Toenninges v. Ga. Dept. of Corr.*, 600 F. App'x 645, 649 (11th Cir. 2015) (explaining "[t]he critical function of the grievance process is that it provides the institution with notice of a problem such that they have an opportunity to address the problem internally").

The first grievance filed after this incident, according to Plaintiff's grievance history, was Grievance No. 270609, submitted on July 15, 2018. (Doc. 138-3, p. 1, 8). This grievance complained that when Plaintiff returned from the hospital on May 19, 2018, inmates stole his property while he was showering off pepper spray. (*Id.*) Plaintiff agrees that this grievance does not relate to the claims in this suit, but he argues that his appeal of this grievance demonstrates that he also filed a separate grievance about the May 2018 attack. (Doc. 161, p. 1-4). He argues that the prison processed only Grievance No. 270609, which prevented him from being able to appeal and exhaust his remedies. (*Id.*).

Throughout this suit, Plaintiff has claimed that he filed Grievance No. 270609 and a second grievance at the same time. Very late in the procedural history of this case, he provided two receipts in support of this argument. (Docs. 155-1, 155-2).[7] When he did not receive an answer for the

---

[7] Plaintiff also argues that Counselor T. Zanders's response to Grievance No. 276905 shows that there were two grievances from July 15, 2018, because she wrote "On 7/15/2018, [Plaintiff] filed one grievance, in both grievances, he requested not to be transferred from Central on 9/13/2018." (Docs. 138-3, p. 22; 161, p. 4). The part Plaintiff highlighted was a recap of *Plaintiff's* allegations and not Counselor Zander's opinion or findings. *Compare* (Doc. 138-3, p. 21 and 22).

missing grievance, he refused to sign the denial and questioned the status of the missing grievance in his appeal of Grievance No. 270609. He later filed multiple grievances raising the issue of the missing grievance. The answers to Grievance Nos. 276905 and 276934 explained that there was no evidence that Plaintiff filed two grievances in July 2018 and that Plaintiff had been informed that the PREA investigation of his claims was unsubstantiated. As explained below, even if Plaintiff's allegation that he filed two grievances on July 15, 2018, is true, he has not fully exhausted.

Plaintiff argues that because staff did not process the missing July 15, 2018 grievance, concerning the assault on May 18, 2018, he could not appeal and therefore could not exhaust. Even without a response to a grievance, however, an inmate may appeal after allowing time to expire for the warden's response. (Doc. 52-1, Ex. 1, p. 14). Whether or not Plaintiff felt such an appeal was futile in the absence of a response, he was still required under the PLRA to complete the full grievance process. *Garcia v. Obasi*, 2022 WL 669611, *4 (11th Cir. March 7, 2022) (citing *Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000)).

In *Garcia*, the plaintiff argued that prison officials essentially waived an exhaustion defense because they had not complied with grievance policy deadlines. *Garcia*, 2022 WL 996611 at * 4. In an unpublished opinion, the Court of Appeals found that the warden's failure to provide a timely response did not make a central appeal unavailable. *Id*. The *Garcia* court reiterated that exhaustion of the grievance process – from submission of a formal grievance through appeal to the central office – was a precondition before filing suit under the PLRA. *Id*. at *5; *see also Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008) (explaining "[t]o exhaust administrative remedies in accordance with the PLRA, prisoners 'must properly take each step within the administrative process.'") (internal citations omitted)).

In this case, when the warden failed to respond, Plaintiff had another avenue to exhaust, which he did not pursue. In the absence of an appeal after he did not receive a response to the missing grievance, he could have filed another grievance about the incident itself instead of complaining that the first grievance was lost and not processed. While a second grievance would have likely been rejected as out of time in the same way Grievance No. 270609 was rejected, it *could* have been excused for good cause. (Doc. 52-1, Ex. 1, p. 8). Plaintiff did not attempt to use this option. Instead, he filed grievances about the missing grievance, which were ultimately rejected for various reasons.

Defendants have failed to address another matter regarding exhaustion – the nature of Plaintiff's allegations and whether he should be excused from exhaustion altogether. Sexual abuse is a non-grievable issue. (Doc. 52-1, Ex. 1, p. 10). Some courts have found that one grievance about a sexual assault and the matter being turned over to investigators could satisfy exhaustion. *See*, *e.g.*, *White v. Staten*, 672 F. App'x 919 (11th Cir. 2016). Other courts have examined the crux of Plaintiff's claims surrounding a sexual assault incident to determine whether exhaustion remains necessary. *See, e.g.*, *Brooks v. Warden*, 706 F. App'x 965 (11th Cir. 2017) (holding that exhaustion was waived but not disputing that the claims surrounding treatment after a sexual assault were grievable); *Finney v. Robinson*, 2023 WL 3806375 (S.D. Ga. May 4, 2023) (finding the failure-to-protect claims for not removing plaintiff from a cell before a sexual assault needed to be exhausted).

Responses to Plaintiff's grievances note that staff informed Plaintiff that the PREA investigation showed his allegations were unsubstantiated on *September 2, 2018*. (Doc. 138-3, p. 26) (emphasis added). This was eleven days *before* Plaintiff appealed Grievance No. 270609 and first raised the issue of the missing grievance. (*Id.* at p. 3-5). The record thus indicates that prison officials were somehow made aware of the sexual assault allegations prior to Plaintiff's appeal of

Grievance No. 270609, whether through the missing grievance or other means. *If* this case rested

on the sexual assault alone, Plaintiff might arguably have exhausted his CSP claims. His claims,

however, are broader than sexual assault. Plaintiff's allegations concern staff inaction, misconduct,

and their ultimate failure to protect him. Plaintiff needed to file a timely grievance and exhaust his

administrative remedies pursuant to policy about the issues underlying his claims. *Woodford,* 548

U.S. at 90 ("Proper exhaustion demands compliance with an agency's deadlines and other critical

procedural rules….") He did not do so, and therefore, his claims against the CSP Defendants must

be dismissed.

### 2. **Plaintiff exhausted his claims at ASMP**

Defendants' motion argues that Plaintiff did not exhaust his claims against the ASMP

Defendants. Defendants characterize Plaintiff's ASMP grievances as an attempt to acquire specific

housing assignments, without giving Defendants notice of any particular threat. (Doc. 138, p. 12).

While it is true that Plaintiff requests a housing reassignment in Grievance No. 277442 and does

not name a specific threat, again citing the CSP attack, the grievance makes a request for new

housing due to general threats by gang members that he "needs to go." (Doc. 138-3, p. 34). The

grievance also states that Plaintiff was no longer being protected by other inmates. (*Id*.) Plaintiff

fully appealed the grievance prior to filing suit. (*Id*. at 34-35). As discussed below, this grievance,

in context with the other facts of the case, does not support a claim that the ASMP Defendants

were deliberately indifferent to Plaintiff's safety, but it does state the minimum factual basis

necessary to exhaust his available administrative remedies. Therefore, Plaintiff exhausted his

available remedies as to the ASMP Defendants.

### 2. **Qualified Immunity**

All Defendants argue that they are protected from suit under qualified immunity because

Plaintiff cannot produce evidence to sustain his failure-to-protect claims. Given the failure to exhaust discussed above, the only claims left for consideration at this stage are Plaintiff's failure-to-protect claims against the ASMP Defendants, Defendants Philbin and McDowell. When considering whether summary judgment is appropriate based on qualified immunity, the Court "[draws] all inferences and [views] all of the evidence in the light most favorable to the nonmoving party." *Jones v. Michael*, 656 F. App'x 923, 925 (11th Cir. 2016) (internal quotations omitted).

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). Defendants "cannot obtain qualified immunity unless [they establish they were] acting within [their] discretionary authority." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir. 2021). It is undisputed that the decisions regarding prison administration fall within Defendants' discretionary authority. *See, e.g., Goebert v. Lee Cty.*, 510 F.3d 1312, 1329 (11th Cir. 2007).

Once action under discretionary authority has been established, "the burden shifts to the plaintiff, who must show the [officers are] not entitled to qualified immunity." *Underwood*, 11 F.4th at 1328.  "At this stage, [the Court asks] two questions: (1) 'whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right,'" and (2) if so, 'whether the right at issue was 'clearly established' at the time of the [defendants'] alleged misconduct.'" *Id.* at 1328 (quoting *Pearson*, 555 U.S. at 231, 232). Both must be present to for a plaintiff to prevail. *Id.* The fact that prison officials may "violate the Eighth Amendment by ignoring a known risk than an inmate would be assaulted by other inmates" has long been a clearly established right. *Q.F.*

*v. Daniel*, 768 F. App'x 935 (11th Cir. 2019) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). Thus, Plaintiff must show a violation of a constitutional right to survive summary judgment.

Following screening, Plaintiff was allowed to proceed with his failure-to-protect claims against the ASMP Defendants, arising initially from his request for protective custody when he entered ASMP based upon the CSP attack. (Doc. 28). Plaintiff alleges that the ASMP Defendants put him in general population knowing about the threats against him, and that the ASMP Defendants failed to keep other inmates from slapping, choking, and pistol whipping him. (*Id.*) Plaintiff does not give the specific dates that these attacks occurred, but the record establishes that he was at ASMP from October 2018 until February 2019, and Plaintiff explained that he was moved to protective custody in December 2018. (Doc. 138-2, p. 73). Plaintiff also states that at least one incident happened following a grievance. (Doc. 138-2, p. 69, 75). As explained in the screening order, a prisoner asserting a failure-to-protect claim must allege (1) a substantial risk of serious harm; (2) the prison officials' deliberate indifference to that risk; and (3) causation. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013). Defendants argue Plaintiff cannot make any of these showings. (Doc. 138, p. 13-17).

Plaintiff's failure-to-protect claims at ASMP are nebulous at best. Even if Plaintiff could establish a substantial risk of serious harm, he cannot clear the hurdle of establishing deliberate indifference to his safety by the ASMP Defendants. Deliberate difference in the failure-to-protect context means that prison officials subjectively knew of the substantial risk of serious harm and the official knowingly or recklessly disregarded that risk. *Goodman*, 718 F.3d at 1332. "The deliberate indifference standard – and the subjective awareness required by it – is far more onerous than normal tort-based standards of conduct sounding in negligence: 'Merely negligent failure-to-protect an inmate from attack does not justify liability under § 1983.'" *Id*. Plaintiff cannot simply

say the ASMP Defendants "should have known" about the threats or "base an inference on mere supposition." *Id*. at 1334.

Plaintiff claims that he requested protective custody at ASMP intake based on the attack at CSP. (Doc. 138-2, p. 65). This statement alone did not place any ASMP official, much less Defendants Philbin and McDowell, on notice that a threat existed at ASMP. Plaintiff testified that the threats from gang members started "within a couple of days" of his arrival to ASMP, but he also states that initially he was protected by his dorm. (*Id*. at 65). He describes several assaults, including one in which he was pistol whipped. He testifies that he started writing to the ASMP Defendants but received no help. (*Id.* at 66). Plaintiff states that Defendant Philbin pulled him out of the dorm and seemed unfazed by Plaintiff's report that he had been beat up. (*Id*. at 67-69). Plaintiff testifies that he talked to Defendant McDowell so often he became a nuisance. (*Id*. at 71). Plaintiff decided only then to file a grievance. (*Id*. at 74). Plaintiff states that multiple beatings continued until his family threatened to go to the media, and only then "they had room for me in protective custody." (*Id*. at 69).

Read together, Plaintiff's deposition and grievances show that many of the attacks alleged by Plaintiff occurred *before* he filed his grievance. (*Id*. at 74; Doc. 138-3, p. 34). He did not complain about being pistol whipped or mention other ASMP attacks in the grievance. (*Id*.) His grievance contended that gang members told him "he needed to go," but the only actual attack mentioned in the grievance was the prior assault at CSP. (Doc. 138-2, p. 34). Plaintiff's allegations regarding ASMP only reference issues with "gang members," without mentioning any specific inmate or threat. The conversations that Plaintiff alleges he had with the ASMP Defendants involved past issues and gave no specific information that would have provided the subjective knowledge necessary to prevent a specific, future attack. Plaintiff only specifically described one

other choking attack that followed the grievance, but again he gave no date or time frame for this attack. (*Id*. at 75). In a later grievance about not being able to hear the TV, Plaintiff stated that he did not want anything "to be said to these gang members that would put me on more danger than I already am." (*Id*. at 38). This grievance, again, details no specific threat by any specific inmate. At best, the record shows that Plaintiff believes the ASMP Defendants "should have known" Plaintiff might be attacked by any gang member at ASMP at any time. The record before the court, construed in Plaintiff's favor, fails to show that either of the ASMP Defendants was in a position to have known Plaintiff was at risk or knowingly and recklessly disregarded such a risk. The ASMP Defendants are entitled to summary judgment.

## CONCLUSION

Plaintiff's motion for a court order (Doc. 162) is **DENIED**. To the extent that Plaintiff's notice (Doc. 163) constitutes a motion to stay or seeks leave of court to file a third response, Plaintiff's requests are **DENIED**. Defendant's motion for leave (Doc. 164) is **DENIED as moot**. Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, it is **RECOMMENDED** that all claims against Defendant Nichols be **DISMISSED without prejudice.** As explained above, it is further **RECOMMENDED** that Plaintiff's motion for summary judgment be **GRANTED** as to all claims.

## <u>OBJECTIONS</u>

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof. Any objection is limited in length to **TWENTY (20) PAGES.** *See* M.D. Ga. L.R. 7.4.  The District Judge shall make a de novo determination of those

portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO ORDERED AND RECOMMENDED**, this 13th day of July, 2023.


s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge